## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **EDWARD TRUE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| **CITY OF BATH,** | ) | |
| | ) | |
| Defendant | ) | |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Edward True, by and through undersigned counsel, hereby complains against Defendant City of Bath as follows:

## INTRODUCTION

1.     This case arises under the Federal Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Maine Family Medical Leave Requirements Law, 26 M.R.S. § 843 *et seq.* ("Maine FMLA"), the Americans with Disabilities Act and amendments thereto, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Maine Whistleblower Protection Act, 26 M.R.S. § 831 *et seq.* ("MWPA"), and the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4551 *et seq.*

2.     This case challenges the following willful, knowing, and/or reckless violations of State and Federal law by the City: (A) Unlawful interference with Plaintiff's rights under the FMLA and Maine FMLA; (B) Retaliation against Plaintiff for exercising his rights under the FMLA and Maine FMLA; (C) Failure to

accommodate, retaliation, and disability discrimination against Plaintiff in violation of the ADA and MHRA; and (D) Whistleblower retaliation against Plaintiff for engaging in protected activity under the MWPA.

## JURISDICTION, PARTIES, AND VENUE

3.     Plaintiff Edward D. True, III ("Plaintiff" or "True") is a United States citizen residing in the Town of Woolwich, County of Sagadahoc, and State of Maine.

4.     Defendant City of Bath ("the City" or "Bath") is a municipality organized under the laws of the State of Maine and located in the County of Sagadahoc and State of Maine.

5.     At all times herein relevant, Plaintiff was an "employee" of the City as that term is defined under the FMLA, Maine FMLA, ADA and MHRA.

6.     At all times herein relevant, the City has employed more than 100 individuals.

7.     This Court has subject matter jurisdiction over True's claims pursuant to 28 U.S.C. § 1331.

8.     Plaintiff filed a timely Charge of Discrimination against the City with the Maine Human Rights Commission ("MHRC") on or about May 4, 2020, alleging disability discrimination, whistleblower retaliation, and MHRA retaliation.

9.     On June 21, 2021, the MHRC issued a Notice of Right to Sue letter pursuant to 5 M.R.S. § 4621.

10.     On July 12, 2021, the parties executed a tolling agreement of all claims for a period of 60 days.

11.   On September 13, 2021, the parties executed a second tolling agreement of all claims for another period of 60 days.

12.   Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in the County of Sagadahoc and State of Maine.

## STATEMENT OF FACTS

13.   True began working for the City of Bath in the Public Works Department in March of 1997 as a heavy equipment operator.

14.   Throughout his employment, True performed his duties satisfactorily.

15.   As far back as 2003, True was recognized for his strong performance as a heavy equipment operator by being promoted to fill the "work leader" position for the Public Works Department.

16.   True suffers from chronic sinus and bronchial infections as well as gout. These medical conditions each meet the definition of a disability under the ADA and MHRA, because they are ongoing in duration (more than six months), require ongoing medical treatment, and they substantially impair True's ability to work and perform other major life functions.

17.   The City was aware of True's chronic health conditions that amounted to a disability under the ADA for years before True's constructive discharge from employment on December 3, 2020.

18.   On December 1, 2015, the City's then Public Works Director (Peter Owen) wrote a memo to True's personnel file related to his "Sick and unpaid time."

19.     Owen met with True on December 1, 2015 to "discuss his use of sick time and the resulting unpaid time that has become a pattern in his weekly pay."

20.     During their meeting, Owen showed True a printout of the sick time he had used in 2015 and indicated there was "a pattern" of going beyond his allotted use of sick time.

21.     In violation of the ADA and the Federal regulations implementing the FMLA, Owen asked True, as his supervisor and not as a human resources representative making a permissible disability-related inquiry under the ADA, "why he has to take so much sick time."

22.     In response to the above illegal disability-related inquiry by his supervisor, True explained as follows, according to the memo written by Owen:

>       He explained that he has a four year old son who has severe ear infections. He is a single father. His ex-girlfriend lives in Phippsburg. His son lives with her but he has joint custody. When his son gets sick he often has to go pick him up from day care and take him to the Dr. and then stay with him the rest of the day if his ex is not available. His mother helps out but is not always available either. In addition, his older son has a cleft lip and has troubles with his teeth and must go to the orthodontist once a month. This results in many events that require him to leave work. Not to mention the times that Ed is sick. Ed has sinus problems.

23.     The above memo put the City on actual, unmistakable notice that True needed intermittent and ongoing FMLA leave to care for his sons.

24.     The above memo also put the City on actual, unmistakable notice that True needed intermittent and ongoing FMLA leave for his own serious health conditions.

25.     The above memo also put the City on actual, unmistakable notice that True had a serious health condition that may qualify as a disability and may require accommodations, yet the City took no steps to further engage in the interactive process with True or inquire about whether he needed an accommodation for a disability.

26.     Owen's memo dated December 1, 2015 concluded by noting that Owen asked True to "do his best to manage his sick time as best he can and try to avoid unpaid leave scenarios as they have been persistent for quite some time."

27.     Given the last line of Owen's memo, the City was on actual, unmistakable notice that True's own health conditions and/or those of his children caused absences from work that needed to be accommodated or designated as FMLA leave.

28.     The printout of personal and sick leave that Owen showed to True included three full work weeks (15 days) of personal time that True needed to take in December of 2014, yet True's personnel file contains no evidence that he was provided FMLA leave or notice regarding his eligibility for FMLA leave during this time.

29.     The City admitted in a filing with the MHRC that it knew of True's need to be absent from work, sometimes as much as once a week, for years.

30.     True's personnel file contains no evidence that he was provided FMLA leave or notice regarding his eligibility for FMLA leave throughout 2015.

31.     On January 4, 2016, the City provided True with a letter acknowledging notice of his need to take intermittent FMLA leave due to his son's health condition.

32.     The City requested certification from True's son's medical provider, Dr. Andrea Tracy, which it received via fax on January 21, 2016. The certification form (WH-380-F) indicated that Dr. Tracy had treated True's son for chronic ear infections on 1/24/14, 2/20/14, 1/12/15, 2/5/15, 2/22/15, 3/10/15, 4/6/15, 4/9/15, 6/4/15, 11/17/15, and 1/21/16.

33.     Dr. Tracy also indicated that the patient was treating with a specialist: "Ear nose throat specialist placed tubes in ears. One tube has fallen out, leaving a perforation. . . . . in addition to chronic otitis media, patient has recurrent upper and lower respiratory tract infections requiring prescription medication."

34.     Dr. Tracy said that True's son's medical condition could go on for the next 3-10 years on an intermittent basis: "Patient is a child, so needs full care by parent when too sick to go to day care. He also needs to be taken to appointments, given medication and comfort."

35.     On February 2, 2016, True requested 32 hours (4 days) of unpaid leave for a sinus infection. The City was on notice that this was a chronic condition that met the definition of a disability at this time, but instead of engaging in the interactive process with True regarding this disability, the City retaliated against him for needing unpaid leave. The City also failed to provide notice to True in February of 2016 of his eligibility to take FMLA leave for his own serious health condition as well as his son's.

36.     On February 18, 2016, True requested 1.5 hours of unpaid leave to watch his son until a babysitter arrived, because his son was home sick from daycare.

Instead of designating this as intermittent and approved FMLA leave, the City retaliated against True for needing this unpaid time off.

37.    On December 7, 2018, the City's Public Works Director, Lee Leiner, emailed human resources representative Erika Helgerson stating that he had a chat with True that day about "unpaid leave."

38.    Leiner's December 7, 2018 email stated that he told True to fill out an FMLA request form because he was "at or near zero on all" forms of paid leave. Leiner also noted that he told True to speak with human resources if he was interested in FMLA leave, but that "I would have to go to disciplinary measures the next time this comes up."

39.    On December 21, 2018, True filled out and submitted to the City a request for 8 hours of unpaid leave due to sickness on November 30, 2018.

40.    True's personnel file contains no evidence that he was provided FMLA leave or notice regarding his eligibility for FMLA leave in late 2016, 2017, or 2018.

41.    In his 2018-2019 annual review, True received the following praise: "Ed successfully completed a Supervisory Leadership class in the spring of 2018. His knowledge of the sewer and drain lines for the City of Bath are exceptional."

42.    In the 2018-2019 review, True received superior ratings in the areas of work quality, leadership, vehicle/equipment operation, and initiative/motivation.

43.    In the 2018-2019 review, True received a "1," which meant "Does Not Meet Expectations" in the area of Dependability. True's supervisor, Jacob Dodge ("Dodge") included in the "Remarks" section "Time Management."

44.     Dodge also wrote on the 2018-2019 review: "Ed needs to work on his time management, so he doesn't have to take time without pay."

45.     In late January of 2019, True slipped on ice in his driveway and injured his foot.

46.     True submitted a doctor's note from Foot and Ankle Associates of Maine, P.A., stating that he had a heel injury and Achilles tendonitis.

47.     Due to Achilles tendonitis and because True was unable to walk, his doctor took him out of work until February 20, 2019.

48.     In February of 2019, True's doctor filled out and True submitted a certification form regarding his serious medical condition and need for leave under the FMLA (Form WH-380-E).

49.     The City designated and approved True's leave as qualifying for FMLA beginning on January 25, 2019 and ending on February 20, 2019.

50.     On February 18, 2019, True's doctor extended his leave to March 4, 2019.

51.     True had attempted to return to work but then needed to take additional time off because the medical condition related to his heel and Achilles tendonitis was diagnosed as a flare of gout.

52.     Notes taken by a representative from the City on May 7, 2019 indicate that True had re-injured his Achilles tendon and "may need surgery." Therefore, the City knew that True was planning on submitting FMLA paperwork.

53.    The certification form that True submitted for his ankle injury/ gout had an estimated return to work date of May 28, 2019.

54.    True was on short term disability for his foot injury in the spring of 2019. The City held this medical leave against True and retaliated against him for needing medical leave.

55.    In July of 2019, True was out of work for another acute flare of gout.

56.    True obtained a doctor's note that indicated he would be out of work from July 8, 2019 to July 10, 2019 and he could return to work on July 11, 2019.

57.    The Notice of Eligibility for FMLA leave form the City provided to True in July of 2019 indicated that he was eligible for FMLA leave.

58.    The Notice of Eligibility form the City provided to True in July of 2019 also required him to "furnish us with periodic reports of your status and intent to return to work upon request" once a week, by submitting reports to the City's Public Works Director, Lee Leiner.

59.    The certification form filled out by True's doctor in July of 2019 indicated that, for severe gout flares, True should be absent from work. True's doctor also indicated that he would need to attend periodic follow up appointments and episodic flare-ups would prevent True from performing his job functions when the condition was active.

60.    Prior to his July 2019 FMLA leave, True had been promoted to a "work leader" in the Public Works Department, which meant he had some supervisory

responsibilities as well as a $2.25 per hour pay increase during shifts where he was designated as the work leader.

61.     After True returned from FMLA leave in July of 2019, the City informed him he would no longer be designated as a work leader because of his absences from work, which were protected by the FMLA and ADA.

62.     True objected to having the work leader position and corresponding pay increase taken from him. He was under the impression that his status as a worker leader was still under review and further discussion would occur between him and the City.

63.     However, when True received his paycheck on July 25, 2019, he realized that he was not compensated for any additional work leader pay.

64.     True immediately filed a grievance through his union representative on July 26, 2019, which stated that: "Employee was deprived of work leader and received a negative performance evaluation because he exercised federally protected rights including but not limited to FMLA."

65.     The negative performance evaluation for attendance occurred on July 19, 2019.

66.     Leiner attempted to deny the grievance as untimely, but the union representative informed him that the work leader issue was ongoing and the negative performance evaluation had happened within 10 days.

67.     City Manager Peter Owen responded to True's grievance by letter dated September 10, 2019, in which he noted that "Worker Leader is not a Union position

but is a temporary assignment made at the discretion of management to provide leadership for a particular project."

68.    Owen's September 10, 2019 letter falsely stated that True had attendance and dependability problems "for many years" that were "outside of his protected FMLA absences." In reality, nearly all of True's absences were FMLA or disability related.

69.    On September 10, 2019, Leiner emailed the human resources representative for the City to report that "Ed continues to call in sick," even though he did not have enough sick time left. Leiner expressed his intention to "take this to the next level with a disciplinary action." HR wrote back to Leiner the same day: "I think [it's] ok to give a written warning at this point, even with the grievance. He is not currently on FMLA."

70.    HR's above email stating that True was "not currently on FMLA" was incorrect and ignored True's known record of a disability as well as his previous certifications affirming the need for intermittent FMLA leave.

71.    True was out of work on December 10, 2019 and December 11, 2019 due to an FMLA-covered illness. During this time, True had another serious bronchial infection that prevented him from working. This illness was part of the ongoing disability that True had first disclosed to the City in December of 2015.

72.    On December 12, 2019, True provided the City with a doctor's note stating that he was out of work on 12/10/19 and 12/11/19 for medical reasons.

73.     The same day, December 12, 2019, the City's Public Works Director, Lee Leiner ("Leiner"), gave True a written warning by letter for "attendance issues."

74.     The December 12, 2019 letter from Leiner said that True was "in violation of the work rules of the Bath Public Works Department."

75.     The December 12, 2019 letter from Leiner specifically referenced True's violation of "rule number 9, Habitual tardiness or absenteeism" and "rule number 10, Misuse of sick leave and/or failure to submit a doctor's excuse."

76.     The December 12, 2019 letter from Leiner noted that "there have been prior discussions with you over a period of many years" regarding attendance issues.

77.     Leiner's December 12, 2019 letter referenced a "historical summary" included in a letter from City Manager Peter Owen to Jay Wadleigh, Business Representative for the Union, dated September 6, 2019, in response to the grievance True had filed.

78.     After acknowledging the grievance filed by True earlier in 2019, Leiner's December 12, 2019 letter stated that, more recently, True had "continued the pattern of taking sick leave immediately after earning it each month." In addition, Leiner said that True had "continued to request unpaid leave after all paid leave has been exhausted. This includes six such days since October 28, 2019."

79.     The six days of unpaid leave referenced by Leiner in the December 12, 2019 included November 1, 2019, which the City marked as "unpaid"; November 6, 2019, which the City marked as "unpaid"; November 25, 2019, which the City marked as a "sick" day; November 26, 2019, which the City marked as "unpaid," and

12

December 10, 2019 and December 11, 2019, both of which the City marked as "FMLA/unp."

80.    Leiner's December 12, 2019 letter recognized that, according to True's voicemail and/or text messages, his "use of personal time in all of these instances" was for illness, but "as of today, you have a balance of zero hours of paid sick leave."

81.    Leiner's December 12, 2019 letter also stated as follows:

The facts are:

- You have continued to take leave for unspecified illnesses after you have exhausted all paid sick time
- You have offered no explanation for these repeated illnesses
- You have established a pattern of taking sick time immediately after earning it
- You have a pattern of utilizing other paid time for use as sick time
- You have done all this after years of repeated warnings to better manage your time away from work

82.    Leiner's December 12, 2019 letter concluded by informing True that his "repeated need for unpaid time is unacceptable," and "Any further violation of work rules will result in suspension, and beyond that, in termination."

83.    Handwritten notes from this time period reflect that the City knew True had chronic sinus problems that met the definition of a disability, stating: "Lee said Ed has a known history of sinus issues, including surgery to correct them."

84.    On or about December 20, 2019, True asked his medical provider to fill out a certification form regarding his serious medical condition under the FMLA (Form WH-380-E).

85.    True submitted a certification form signed by his medical provider on December 20, 2019, explaining his serious health condition that included chronic episodes of sinus infections and allergies, which would require treatment visits at least twice a year.

86.    The certification form submitted by True dated December 20, 2019 indicated that he was unable to perform any of his job functions when the condition was present. In addition, the form indicated that True would be incapacitated for single continuous periods of time due to his serious health condition, and he would also have episodic flare ups requiring leave.

87.    On or about January 9, 2020, True filed a grievance and/or written request by letter to Leiner, Director of Public Works, asking to have the December 12, 2019 written warning removed from his personnel file.

88.    In response to this request, Leiner wrote a letter to True dated February 7, 2020, indicating that he would remove the written warning from True's personnel file because the leave in December ended up being approved as FMLA leave.

89.    Leiner's February 7, 2020 letter claimed that True's "FMLA protected leave does not factor into any disciplinary issues," but also stated that: "this does not negate the attendance pattern you have had for several years, which has continued in-between your FMLA absences. Despite repeated conversations and warnings, you are still exhausting paid leave soon after earning it and often requesting unpaid leave. Your absences are frequent, sporadic, and unplanned, which makes it difficult to plan work for the sewer crew."

14

90.    The above letter from Leiner to True amounts to direct evidence of FMLA interference and retaliation, because True's historical absences were almost exclusively related to his own or his son's serious health condition.

91.    The City continued to take adverse action against True. In March of 2020, the Public Works Department released a list of the most senior employees. Despite True's long tenure, previous work leader promotion, and "exceptional knowledge," the City no longer listed True as a work leader by March of 2020.

92.    In January of 2020, True missed two days of work due to illness, but the City failed to designate his leave as FMLA-related. The City also failed to provide True with notice of whether he was eligible for FMLA leave in January of 2020.

93.    In February of 2020, True did not miss a single day of work for illness; in fact, due to weather he worked 12 days straight without a day off between February 3, 2020 and February 14, 2020.

94.    On February 6, 2020, True worked a 21-hour day due to weather.

95.    On February 7, 2020, True worked a 15-hour day due to weather.

96.    On February 18, 2020, True worked a 15.5-hour day due to weather.

97.    True needed FMLA leave again in March of 2020 for his own health condition. He was out the full week of March 2, 2020 and the first three day of the following week.

98.    The FMLA certification form that True submitted to the City, signed by his doctor, indicated that True had "influenza B," was still contagious, and was

experiencing "severe fatigue, cough, and has difficulty with ADLs," resulting in the inability to work until March 12, 2020.

99.     The amount of FMLA leave that True needed and requested never exceeded 12 weeks.

100.    The City retaliated against True for exercising his rights under the FMLA and Maine FMLA for years. Even in its filing with the MHRC on July 6, 2020, while True was still employed, the City was critical of True for taking leave that was protected by the FMLA, stating as follows: "Then, *in just the first half of 2019*, Complainant's work attendance plummeted; over the course of 168 days from January 25 to July 11, Complainant used two days of personal time, over 24 days of vacation time, six days of sick time, *and over 29 days of unpaid time* (this included a 31-day stretch from January 29 to March 1 in which he took 24 days of unpaid time). Moreover, by July 10, 2019, Complainant had already used nine out of his 12 weeks of FMLA leave for the year."

101.    The above statement to the MHRC is direct evidence of the City's retaliation and discriminatory animus toward True for taking leave that he was entitled to under Federal and State law, which the City had already approved as protected FMLA leave.

102.    The City's stated reason for taking the work leader position away from True, along with a $2.25 per hour bump in pay, was that unplanned absences in the role of work leader led to work delays. However, this stated reason is pretext because

the City also admitted that the work leader role fluctuated among different employees on a regular basis.

103. By December of 2020, True could no longer withstand the pattern of discrimination, retaliation, and overt hostility toward him for needing FMLA leave and accommodations under the ADA.

104. For years, True felt harassed and bullied by the City every time he needed to take protected leave. The emotional distress of having to ask for time off for his own serious health condition, or that of his children, became unbearable. The stress caused by the City's nonstop retaliation was negatively impacting every aspect of True's life.

105. True found it impossible to work for the City in an environment where he was being unfairly scrutinized and criticized out of retaliation.

106. True's superiors showed outright hostility toward him that made it intolerable to keep working for the City. In addition, True continued to be denied the work leader position on many occasions, thereby depriving him of pay that he should have received.

107. The City's repeated violations of the FMLA and ADA were so objectively and subjectively offensive and intolerable that True was constructively discharged from employment effective December 3, 2020, after which he did not return to work for the City.

108.   True wrote a letter to the City Manager on December 3, 2020 explaining that he felt compelled to resign from employment due to his ongoing health issues as well as leadership within the City of Bath.

## COUNT I – VIOLATION OF THE FMLA
### (29 U.S.C. § 2615(a))

109.   Plaintiff repeats the allegations contained in Paragraphs 1 through 108 above as if fully stated herein.

110.   At all times herein relevant, True was eligible and qualified for leave under the FMLA.

111.   True's diagnoses of chronic sinus/bronchial infections, Achilles tendonitis, and gout each constituted serious health conditions within the meaning of the FMLA.

112.   True's children both had serious health conditions within the meaning of the FMLA.

113.   The City approved True for intermittent and ongoing FMLA, but then took disciplinary action against him for using such leave.

114.   In retaliation for True's previous requests for FMLA leave, the City ignored his requests for unpaid leave that qualified under the FMLA and refused to "count" unpaid leave as FMLA-qualifying, in violation of law.

115.   The City violated the Federal regulations implementing the FMLA by failing to follow proper procedures for requesting certification and/or recertification of the need for leave. For example, the City violated Federal regulations by requiring True to report his work status to the City on a weekly basis.

116.    Whenever reasonably possible, True provided the City with appropriate notice of his need to take full and/or intermittent leave under the FMLA.

117.    The City retaliated against True for exercising his rights under the FMLA by failing to restore him to the position he held when the leave commenced or to a position with equivalent seniority status, employee benefits, pay, and other terms and conditions of employment.

118.     The City violated the FMLA by failing to provide appropriate notice to True when it knew or should have known that he was sick or requesting leave for an FMLA-covered reason every time he was out for illness, but it refused to count his time off as protected under the FMLA.

119.    The City violated the FMLA by disciplining and criticizing True for needing FMLA leave, and then pretextually claiming that the discipline True received was for non-FMLA unpaid leave.

120.    The City also retaliated against True for filing a grievance for the unwarranted and discriminatory discipline he received in July and December of 2019.

121.    Between 2015 and the date of his constructive discharge on December 3, 2020, True repeatedly availed himself of a protected FMLA right.

122.    On multiple occasions between 2015 and December 3, 2020, True suffered adverse actions in his employment, including demotion/reduction in pay, unwarranted discipline, the threat of suspension or termination, and creation of a hostile work environment. Each of the adverse actions suffered by True had a causal connection to his exercise of protected FMLA rights.

123.    The City violated the FMLA by implementing a "no-fault" attendance policy that did not take into account True's prior certifications and approval for FMLA leave.

124.    Because of the City's FMLA violations described herein, True suffered and is entitled to damages, including but not limited to lost wages and benefits, statutory and liquidated damages, punitive damages, attorney's fees, costs, and expenses.

125.    The City's violations of the FMLA were committed willfully, justifying an award of punitive and/or liquidated damages in this case.

WHEREFORE, Plaintiff Edward D. True, III requests that the Court award him damages for Defendant's violations of the FMLA in the form of lost back pay, front pay, liquidated damages, statutory and punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT II – FMLA INTERFERENCE
### (29 U.S.C. § 2615(a))

126.    Plaintiff repeats the allegations contained in Paragraphs 1 through 125 above as if fully stated herein.

127.    In addition to the FMLA violations set forth above, the City had a longstanding pattern of discouraging employees like True from taking unpaid leave, even for qualifying reasons under the FMLA or for leave that had already been approved under the FMLA.

128.   By falsely claiming that True had a longstanding pattern of excessive absenteeism for non-FMLA reasons, even though his absences were almost entirely due to serious health conditions under the FMLA, the City intentionally discouraged True from taking protected leave under the FMLA.

129.   The City interfered with True's substantive rights under the FMLA by failing to provide him with notice of his right to take leave, or by failing to count his unpaid leave as FMLA leave, on many occasions when he was sick. The City's failure to provide True FMLA-designated leave was intentional because the City knew about True and his son's chronic health conditions, for which True had used FMLA in the past.

130.   The City also interfered with True's rights under the FMLA by continuing with the above illegal conduct even after he opposed practices made unlawful by the FMLA.

131.   The City's interference with True's substantive rights under the FMLA caused him actual harm because he did not take all the leave to which he was entitled. On occasions, True suffered financial loss because he needed to hire babysitters to watch his sick child (on top of already paying for daycare, which the child could not attend), rather than risk being disciplined under the false and illegal guise of "absenteeism" if he took time off to care for his son. True's own health also suffered by not taking all of the FMLA leave to which he was entitled, and therefore not having adequate time to recover from illness.

132.    As a result of the City's willful FMLA interference, True has suffered and is entitled to damages, including but not limited to lost wages and benefits, back pay and front pay, attorney's fees, costs, and expenses.

WHEREFORE, Plaintiff Edward D. True, III requests that the Court award him damages for Defendant's violations of the FMLA in the form of lost back pay, front pay, liquidated damages, statutory and punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT III – VIOLATION OF THE MAINE FMLA
### (26 M.R.S. § 847)

133.    Plaintiff repeats the allegations contained in Paragraphs 1 through 132 as if fully stated herein.

134.    As set forth more fully in Counts I and II above, the City has engaged in intentional conduct that also violates the Maine FMLA.

135.    In addition to the damages requested in Counts I and II above, True is entitled to an award of liquidated damages under the Maine FMLA because Defendant's conduct was willful. True is entitled to liquidated damages of $100 per day dating back six years from the date this Complaint was filed.

WHEREFORE, Plaintiff Edward D. True, III requests that the Court award him damages for Defendant's violations of the Maine FMLA in the form of lost back pay, front pay, liquidated damages, statutory and punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT IV – DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA
### (42 U.S.C. § 12101 *et seq.*)

136.   Plaintiff repeats the allegations contained in Paragraphs 1 through 135 as if fully stated herein.

137.   True was a qualified individual with a disability within the meaning of the ADA.

138.   The City regarded True as having a disability that substantially impaired his ability to work and perform the "work leader" position.

139.   True had a record of a disability.

140.   The City discriminated against True because of his perceived or actual disability.

141.   The City regarded True as having a disability that required treatment and time off from work in the past but failed to provide him with the requested time off as an accommodation for his disability.

142.   The City failed to provide True with all of the accommodations that were reasonable and feasible to enable him to perform the essential functions of his job.

143.   When the City did provide True with accommodations for his disability, it also subjected him to discipline and adverse action for needing accommodations.

144.   The City's stated reasons for disciplining and criticizing True, and taking away his additional work leader pay, were really pretext for disability discrimination.

145.    In addition to failing to accommodate True's disability, the City failed to engage in the interactive process with True despite his obvious need for an accommodation.

146.    The City's attendance policy, to the extent it was neutral instead of illegally enforced in retaliation against True, nonetheless had a disparate impact on True as an individual with a disability.

147.    The City subjected True to disparate treatment on the basis of his disability and treated him less favorably than similarly situated employees.

148.    The City violated the ADA by making illegal disability-related inquiries about his need for "sick days" instead of following the appropriate protocol for asking an employee if an accommodation is needed for a disability.

149.    As a result of Defendant's disability discrimination and willful violation of the ADA, True has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Edward D. True, III requests that the Court award him damages for Defendant's violation(s) of the ADA, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT V – RETALIATION UNDER THE ADA
### (42 U.S.C. § 12101 et seq.)

150.    Plaintiff repeats the allegations contained in Paragraphs 1 through 149 of the Complaint as if fully stated herein.

151.    Throughout his employment, the City created a hostile and abusive work environment that made True fear he would lose his job if he needed to take even an hour off to care for himself or his sick child.

152.    Throughout his employment, the City retaliated against True for requesting accommodations and having a disability under the ADA.

153.    The City took adverse action against True for exercising his protected rights under the ADA, including after he filed a grievance and a charge of discrimination with the MHRC.

154.    As a result of Defendant's retaliatory actions, True has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Edward D. True, III requests that the Court award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT VI – WHISTLEBLOWER RETALIATION
### (26 M.R.S. § 831 *et seq.*)

155.   Plaintiff repeats the allegations contained in Paragraph 1 through 154 of his Complaint as if fully set forth herein.

156.   For all of the reasons set forth above, True repeatedly engaged in protected activity within the meaning of the Maine Whistleblower Protection Act by making complaints of illegal discrimination and retaliation against him by the City.

157.    True had a reasonable basis for believing that the City's conduct toward him was illegal under the FMLA and ADA.

158.   True engaged in the aforementioned protected activity in good faith.

159.   True had every intention of staying with the City of Bath for the rest of his career. In fact, if True had not felt compelled to resign from employment in December of 2020, he would have been entitled to higher Maine State Employees' Retirement benefits after 25 years of employment with the City.

160.   It was only after the City repeatedly disregarded True's complaints, and retaliated against him for taking protected leave, that True felt he could no longer bear the emotional and physical stress of working for the City.

161.   Each of the aforementioned instances of protected conduct had a causal connection to the adverse actions alleged herein.

162.   In this particular case, the causal connection has a lengthy temporal scope, because there is direct evidence that the City retaliated against True in 2019 and 2020 for absences he took in 2014, 2015, 2016, 2017, and 2018.

WHEREFORE, Plaintiff Edward D. True, III requests that the Court award him damages in the form of lost back pay, front pay, compensatory damages, civil penal damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT VII – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
### (5  M.R.S. § 4571 *et seq.*)

163.    Plaintiff repeats the allegations contained in Paragraphs 1 through 162 of the Complaint as if fully stated herein.

164.    For all of the reasons set forth in Counts IV, V, and VI above, the City has also violated the Maine Human Rights Act by engaging in unlawful disability discrimination and retaliation, as well as whistleblower retaliation.

165.    As a result of the City's violations of the Maine Human Rights Act, True has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Edward D. True, III requests that the Court award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## JURY TRIAL DEMAND

Plaintiff Edward True hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated: November 12, 2021                    */s/ Laura H. White*

                                             _____

Laura H. White, Bar No. 4025
Danielle M. Quinlan, Bar No. 5480
*Attorneys for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*
*dquinlan@whiteandquinlan.com*